# EXHIBIT 2

Case 1:13-cv-00260-JEB   Document 10-2   Filed 06/28/13   Page 1 of 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, ) ) ) Plaintiff, ) ) v. ) ) U.S. DEPARTMENT OF HOMELAND SECURITY ) ) ) Defendant. ) ) | Civil Action No. 13-260 (GK) |

**DECLARATION OF JAMES V.M.L. HOLZER, I, IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, James V.M.L. Holzer declare and state as follows:

1. I am the Senior Director of FOIA Operations for the Department of Homeland Security Privacy Office (DHS Privacy). I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C. §552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access Statutes and Regulations. I have held this position since November 7, 2012. Prior to that, I held the position of Director of Disclosure and FOIA Operations. I have been with the Department since 2009. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the records in the files established for processing FOIA requests and upon information furnished to me in the course of my official duties. Through the exercise of my official duties, I have also become familiar with the background of this case and have read a copy of the complaint.

2. The purpose of this declaration is to provide an overview of the FOIA process at DHS, and to explain how the FOIA request that is the subject of the instant litigation was processed. This declaration is submitted in support of defendant's motion for summary judgment.

3. The Department of Homeland Security's (DHS) FOIA operations is carried out by the DHS Privacy Office.  FOIA requests directed to DHS are reviewed by DHS Privacy, and that office also refers those requests to the DHS offices and components likely to possess responsive documents.  DHS Privacy also oversees FOIA and Privacy Act operations throughout DHS.

4. After DHS Privacy receives a FOIA request, that request receives a unique identification number.  DHS Privacy uses the unique identification number to track the status of all FOIA requests that it receives.  DHS Privacy then reviews the request to determine which DHS office or component is likely to possess responsive documents.  This review may include conversations with DHS component FOIA offices to determine if they had received the same request directly from the public and if the component has responsive documents.

5. In addition to DHS Privacy, DHS components maintain offices that handle FOIA requests. These offices also use an automated case tracking systems which assigns case control numbers to all FOIA requests received by that component. Components log all incoming FOIA requests into an automated case tracking system, and input information about each request into the system (including, but not limited to, the requester's name and/or organization and, in the case of FOIA requests, the request's topic).  These numbers are used to track the status of incoming FOIA requests.

6. The mission of DHS's National Protection and Programs Directorate (NPPD) is to assure a safe, secure, and resilient infrastructure.  There are four subcomponents within NPPD, which are the Federal Protective Service (FPS), Office of Cybersecurity and Communications


(CS&C), Office of Infrastructure Protection (IP), and Office of Biometric Identity Management (OBIM).  FPS provides security and law enforcement services to federally owned and leased buildings, facilities, properties.  CS&C's mission is to assure the security, resiliency, and reliability of the nation's cyber and communications infrastructure.  IP leads a coordinated national effort to reduce risk to our critical infrastructure.  OBIM uses innovative technological solutions to provide decision-makers with accurate biometric-based information.

7. NPPD also has a FOIA Office, which processes FOIA requests received directly from the general public by postal delivery or email, and those referred to it by DHS Privacy, DHS component FOIA offices and federal agencies.  The NPPD FOIA office processes FOIA requests for all NPPD subcomponents and offices.

8. When the NPPD FOIA office personnel receive a referral or tasking from DHS Privacy or some other source, NPPD FOIA personnel make a determination regarding which NPPD subcomponent or program office may have responsive documents, and then refer the request to the appropriate subcomponent or office.

## EPIC'S JULY 10, 2012 FOIA REQUEST

9. On July 18, 2012, DHS Privacy received a FOIA request from EPIC dated July 10, 2012.  EPIC requested the following categories of records: (1) the full text of Standard Operating Procedure 303 (SOP 303), which describes a shutdown and restoration process for use by "commercial and private wireless networks" in the event of a crisis**;** (2) the full text of the pre-determined "series of questions" that determines if a shutdown is necessary; and (3) any executing protocols or guidelines related to the implementation of SOP 303, distributed to DHS, other federal agencies, or private companies, including protocols related to oversight of shutdown determinations.

10. When DHS Privacy received EPIC's FOIA request it had to determine which offices at DHS would be most likely to have records responsive to the request. EPIC specifically mentioned the National Communications System (NCS) and the National Coordinating Center for Communications (NCC) in its request, each of which was or is an NPPD organization. The NCS was formerly an organization within NPPD that was established to provide the Federal Government with national security and emergency preparedness communications as well as formulate and implement policies in this area. By Executive Order 13618 on July 6, 2012, the NCS was eliminated, and replaced with an alternate structure for performing the same functions. Also, DHS was directed to establish an organization performing the functions of the NCC. The NCC is a joint government/industry operation, which is housed within the CS&C subcomponent of the NPPD, and which coordinates the initiation, restoration and reconstitution of national security and emergency preparedness communications services nationally. Based on the request's reference to NCS and NCC, DHS Privacy contacted the NPPD FOIA Office to determine if that office was familiar with the subject matter of the request.

11. The NPPD FOIA office believed that there were no responsive records. As discussed more fully below, the NPPD FOIA Office was incorrect, in that NPPD indeed had responsive documents, namely SOP 303. The NPPD FOIA office learned of its mistake later. The mistake was due in part to confusion regarding a similar FOIA request from another requester seeking certain records relating to the <u>activation</u> of SOP 303, but not the SOP itself, as EPIC had requested. Because the two FOIA requests were pending within the same timeframe and dealt with the same general subject matter area, NPPD did not fully appreciate the difference between EPIC's request, which sought only three specific categories of documents (i.e., the full text of SOP 303, the full text of the series of questions used to determine the necessity of shutdown, and

any executing protocols or guidelines), and the other FOIA request, which sought records related to particular security events where the SOP may have been implemented and activated.

12. In addition to referring EPIC's request to NPPD, DHS Privacy also directed the DHS Management Directorate (MGMT), the Office of the Chief Information Officer (OCIO) and the Under Secretary for Management (USM) to search for responsive documents. DHS Privacy believed that these offices would be likely to have documents related to communications policy, such as SOP 303. The DHS Management Directorate is the office responsible for Department budgets and appropriations, expenditure of funds, accounting and finance, procurement, human resources, information technology systems, facilities and equipment, and the identification and tracking of performance measurements. Because of its broad portfolio, MGMT often will know about a policy, procedure or initiative, and DHS Privacy often directs MGMT to search for responsive documents.

13. DHS Privacy directed that OCIO conduct a search because the request related to communications. OCIO is often involved in, and consulted on, information and communication issues, which might have had some information about the subject matter of the request. USM also was tasked to conduct a search because, like MGMT, it has a broad portfolio. The office oversees (i) the promulgation of policy, (ii) operations and (iii) oversight, for each of the critical management lines-of-business. These lines of business include: acquisition, human capital, budget and finance, information technology, capital assets, and security.

14. DHS Privacy sent an acknowledgement to EPIC on July 24, 2012, assigning the matter file number DHS/OS/PRIV 12-0598 and indicated that DHS Privacy had tasked MGMT, OCIO, and USM with a search based on the opinion that those offices would be most likely to have records responsive to the request.

15. Each office conducted a search for documents related to the SOP, using the search terms "Standard Operating Procedure 303" and "SOP 303." These offices do not have one database to search for records that are responsive to Freedom of Information and/or Privacy Act requests. Consequently, each of the component offices was tasked to search for records. In this instance, for purposes of coordination, search requests were sent to the Chief of Staffs in each of the three Offices mentioned above. In each case, the offices searched shared computer drives, Share Point sites, and emails for information about the requested records. These are the storage places where DHS employees would typically place information about the products they are working on as well as copies of any final products that are proposed for dissemination or are actually disseminated. In each case, the Offices reported no records responsive to the request.

16. DHS Privacy sent its final response to EPIC on August 21, 2012. In the final response, DHS Privacy said that MGMT, OCIO, and USM, had conducted comprehensive searches for records that would be responsive to the request. DHS Privacy also said that these offices were unable to locate or identify any responsive records.

17. On October 2, 2012, DHS Privacy received an appeal from EPIC dated September 13, 2012. DHS Privacy acknowledged the appeal on October 25, 2012. DHS Privacy forwarded the appeal to the United States Coast Guard, Office of the Chief Administrative Law Judge (ALJ), as that office reviews FOIA appeals on behalf of DHS' Office of the General Counsel.

18. By the letter dated March 25, 2013, the ALJ notified DHS Privacy that it had reviewed the appeal, and it remanded the matter back to DHS Privacy for further review.

19. On April 19, 2013, DHS Privacy reached out to various offices, including MGMT, OCIO, and USM at DHS Headquarters to again inquire as to whether these offices might have responsive documents. DHS Privacy also contacted NPPD again, at which point, the NPPD

FOIA Office realized that there was confusion about the nature of EPIC's request. The NPPD FOIA Office realized that NPPD would have one or possibly more records responsive to the EPIC request. NPPD conducted a search and quickly identified, in the files of the NCC, the only document that is responsive to the request. Specifically, NPPD consulted with the NCC because the NCC is the author of the SOP and implements the SOP. According to the NCC, there are no other documents that contain either the full text of the questions or any executing protocols or guidelines.

20. SOP 303 was drafted by the NCC and approved by CS&C on March 17, 2006. It has been periodically updated so that names and contact information contained therein remains current. The SOP was compiled for a law enforcement purpose, which includes activities related to national security and homeland security. It was inspired by the Letter to the President on Emergency Wireless Protocol and Recommendations, dated March 1, 2006, and generated by the National Security Telecommunications Advisory Committee (NSTAC), an industry-led Presidential advisory committee established by Executive Order 12382. In the aftermath of the 2005 bombings in the London transportation system, the NSTAC perceived the need for a single governmental process to coordinate determinations of if and when cellular shutdown activities should be undertaken in light of the serious impact on access by the public to emergency communications services during these situations and the need to preserve the public trust in the integrity of the communications infrastructure. Consistent with the NSTAC's recommendation, the NCC developed SOP 303 as a unified voluntary process for the orderly shut-down and restoration of wireless services during critical emergencies such as the threat of radio-activated improvised explosive devices. The SOP establishes a procedure by which state homeland

security officials can directly engage with wireless carriers, and it establishes factual authentication procedures for decision-makers.

21. Included as part of SOP 303 itself are the two other categories of records that EPIC seeks, *i.e.*, the full text of the pre-determined series of questions that determines if a shutdown is necessary, and the executing protocols related to the implementation of SOP 303. Again, DHS Privacy, in conjunction with the NCC, determined that the SOP is the only responsive document because there are no other documents that contain the full text of the questions or any executing protocols.

22. Portions of the SOP are being withheld pursuant to FOIA Exemptions b(6), b(7)(c), b(7)(e), and b(7)(f), as the SOP contains security procedures and related information regarding the shutdown of cell phone service during various types of homeland security incidents, and personal information about certain law enforcement officials. After a review for segregability, NPPD FOIA Office determined that some information in the SOP could be released without compromising law enforcement or privacy objectives. DHS Privacy agrees with the assessment.

23. FOIA Exemption b(6) protects from disclosure information about individuals when the disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(6). DHS applied the b(6) exemption to protect the names, direct-dial telephone numbers, and email addresses for state homeland security officials who have an expectation of privacy. The redacted information does not directly shed light on the operations or activities of the government. The release of this information would constitute an unwarranted invasion of personal privacy, possibly subject the persons to harassment by the public and inquiries by the media, and potentially facilitate targeting of these officials by bad actors.

24. FOIA Exemption b(7)(c) permits the withholding of personal information in law

enforcement records. DHS applied the b(7)(c) exemption to protect the names, direct-dial telephone numbers and e-mail addresses of high-ranking officials within each state's homeland security agency.  The release of this information would not shed lights on the agency's operations or activities and would constitute an unwarranted invasion of personal privacy, possibly subject the persons to harassment by the public and inquiries by the media, and potentially facilitate targeting of these officials by bad actors.

     25. FOIA Exemption b(7)(e) permits the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations." The b(7)(e) exemption applies because the requested document contains a homeland security procedure primarily intended to efficiently and effectively deter the triggering of radio-activated improvised explosive devices.  During the course of incidents involving the potential for improvised explosive devices to be dispersed over a wide geographic area, orderly deactivation of wireless networks may be the best option for preventing and/or mitigating explosions that would endanger life and property.  SOP 303 establishes a protocol for verifying that circumstances exist that would justify shutting down wireless networks. It also ensures that decision makers consider potential public safety hazards when deciding whether to shut-down a wireless network, such as the inability of first-responders and the public to use wireless phones for calls, including 911 calls. In addition, SOP 303 provides a step-by-step process for the orderly shut-down of wireless networks following verification of the facts and appropriate weighing of the circumstances.  Finally, SOP 303 coordinates orderly resumption of wireless service.  Making SOP 303 public would enable bad actors to circumvent or interfere with a law enforcement strategy designed to prevent activation of improvised explosive devices by providing information about when shutdown procedures are used and how a shutdown is

executed.

26. FOIA Exemption b(7)(F) permits the withholding of records necessary to protect the physical safety of "any individual." Making SOP 303 public would, *e.g.*, enable bad actors to insert themselves into the process of shutting down or reactivating wireless networks by appropriating verification methods and then impersonating officials designated for involvement in the verification process. The aim of such bad actors would be to disable the protocol so that they could freely use wireless networks to activate the improvised explosive devices. Given that disclosure of the requested information could reasonably lead to circumvention of or interference with a procedure aimed at preventing the triggering of improvised explosive devices, there is a reasonable expectation that disclosure could reasonably endanger individuals' lives or physical safety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of June, 2013.

*James VML Holzer, J*

_____

James V.M.L. Holzer