## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) |  |
| ELECTRONIC PRIVACY | ) |  |
| INFORMATION CENTER, | ) |  |
|  | ) |  |
|     Plaintiff, | ) |  |
|  | ) |  |
|     v. | ) | Case No. 1:13-CV-260 (JEB) |
|  | ) |  |
| DEPARTMENT OF HOMELAND | ) |  |
| SECURITY, | ) |  |
|  | ) |  |
|     Defendant. | ) |  |
| _____ | ) |  |

## REPLY BRIEF IN SUPPORT OF DHS'S MOTION SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff does not now dispute that the Department of Homeland Security (DHS) conducted an adequate search for responsive documents under the Freedom of Information Act (FOIA).[1] *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Opp.), July 26, 2013, Doc. No. 11. Nor does plaintiff challenge DHS's decision to withhold portions of Standard Operating Procedure (SOP) 303 – the only document at issue – under Exemptions 6 and 7(C), to protect privacy interests. Opp. at 5 n.1; 5 U.S.C. § 552(b)(6), (7)(C). And plaintiff does not deny that SOP 303 was compiled for law enforcement purposes, a prerequisite to the invocation of Exemption 7. *See* Opp. at 9.

---

[1] As plaintiff did not defend its adequacy-of-the-search claim (Count II), the claim should be dismissed. *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Plaintiff also failed to defend Count I, which addressed statutory deadlines, so that claim should be dismissed as well.

But plaintiff has not conceded all of DHS's arguments – though it should have.  It raises three primary arguments in opposition to DHS's motion for summary judgment and in support of its own:  (1) Exemption 7(E) does not apply because SOP 303 does not constitute a technique for a law enforcement investigation; (2) Exemption 7(F) does not apply because the disclosure of SOP 303 would not reveal an individual's identity, DHS cannot identify specifically who would be endangered, and the danger is hypothetical; and (3) DHS has not demonstrated that it has segregated and released all non-exempt information.  Opp. at 7-13, 14-17.

None of these arguments has merit.  SOP 303, in fact, constitutes a technique for law enforcement investigations under *U.S. News & World Report v. Dep't of Treasury*, 1986 U.S. Dist. LEXIS 27634, at *6-7 (D.D.C. March 26, 1986), and by preserving evidence through preventing the detonation of bombs.  Plaintiff's cramped understanding of Exemption 7(F) contradicts the text and purpose of this broadly worded exemption, and lacks precedential support.  Similarly, plaintiff's contention that DHS has not released all non-exempt information is unavailing because DHS detailed the contents of SOP 303, explained that it reviewed the document for – and released – all non-exempt information, and described the harm that would follow if it were to release more information.  *See Johnson v. Executive Office for United States Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)

Notwithstanding that it has filed a cross-motion for summary judgment, plaintiff contends that there exist material disputes of fact.  Plaintiff's Statement of Disputed Material Facts as to Which There Is a Genuine Issue (Pl. SMF), July 26, 2013, Doc. No. 11-3.  Upon inspection, however, the factual disputes all reveal themselves to be legal disputes, and thus no impediment to the entry of summary judgment.  In addition to the errant positions described above, plaintiff provides a warped picture of the interpretative principles applicable to FOIA by

excessively downplaying the important role played by the exemptions.  Thus, the memorandum starts by providing a fuller picture of these guiding principles, before detailing the flaws in plaintiff's other positions.

For the reasons stated above and in DHS's opening brief, the Court should enter judgment in DHS's favor with respect to the only remaining claim – plaintiff's claim that DHS unlawfully withheld agency records (Count III).[2]  The Court should, thus, also deny plaintiff's cross-motion for summary judgment.

## ARGUMENT

I.    Courts Give FOIA Exemptions "Meaningful Reach and Application"

Plaintiff emphasizes that the FOIA is a "disclosure statute," *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1262 (2011), and that exemptions must be "narrowly construed," *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008).  Opp. at 5-7.  Indeed, plaintiff stresses these points to the exclusion of other important interpretative principles applicable to the FOIA and, in so doing, distorts the governing legal framework.  While it is true that Congress intended for the FOIA to facilitate the disclosure of information, Congress also recognized that "public disclosure is not always in the public interest."  *CIA v. Sims*, 471 U.S. 159, 166-67 (1985).  Accordingly, it created exemptions to disclosure.  And because "important interests [are] served by the exemptions," *FBI v. Abramson*, 456 U.S. 615, 630-31 (1982), courts should give them "meaningful reach and application," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  Thus, insofar as the exemptions are concerned, "broad language – even when construed narrowly – is still broad language."  *Mayer Brown v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).

---

[2] Plainitff has abandoned the other claims in its complaint.  *See* n.1.

II.     Exemption 7(E) Justifies the Withholding of Portions of SOP 303

Exemption 7(E) protects law-enforcement documents that "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . ."  5 U.S.C. § 552(b)(7)(E).  As DHS explained in its opening brief, SOP 303 describes a technique for law enforcement investigations.  Memo. in Support of Summ. J. (SJ Memo.), June 28, 2013, Doc. No. 10, at 11-12.  A technique is a "procedure" or "particular way of doing or of going about the accomplishment of something."  Webster's Third New Int'l Dictionary (1986).  SOP 303 establishes a procedure for coordinating the orderly shutdown of a wireless telecommunications network to prevent, among other things, the use of the network to remotely detonate an explosive.  Holzer Decl. ¶ 25 (attached as Ex. 2 to SJ Memo., Doc. No. 10).  And a Court in this district has concluded that preventative law enforcement activities fall within the confines of Exemption 7(E) because "it is difficult to imagine agency procedures or techniques more deserving of protection."  *U.S. News*, 1986 U.S. Dist. LEXIS 27634, at *6-7 (shielding from disclosure the Secret Service's contract specifications for the President's armored limousine).

In its opposition brief, Plaintiff responds that SOP 303 is a technique for "disabling a wireless telecommunication network . . . not a technique for a law enforcement investigation or prosecution."  Opp. at 9.  Plaintiff adds that "DHS offers no explanation for how SOP 303 plays any role in investigations or prosecutions, and no conceivable connection exists."  *Id.*  But, in advancing this argument, plaintiff fails to address – or even mention – *U.S. News*.  In *U.S. News,* the plaintiff sought all "records pertaining to the Secret Service's purchase of two armored limousines for the President."  *U.S. News*, 1986 U.S. Dist. LEXIS 27634, at *1.  The Secret Service invoked Exemption 7(E), as releasing these documents would have revealed details about its efforts to safeguard the President; plaintiff objected that the documents sought would

4

"reveal 'protective' not 'investigative' techniques and procedures."  *Id.* at *6.  The court rejected

the plaintiff's "wooden interpretation of the statutory language," concluding that "[i]t is

inconceivable . . . that Congress meant to afford [preventative law enforcement] activities any

less protection from disclosure simply because they do not fit within the traditional notion of

investigative law enforcement techniques."  *Id.*  The same rationale applies to this case.

Plaintiff never distinguishes *U.S. News* from this case; indeed, it does not even try.  There is a

good reason for that inaction:  The cases are indistinguishable.  And just as the Court in *U.S.*

*News* rejected the "wooden interpretation of the statutory language" that would have hampered

the Secret Service's efforts to protect the President, so this Court should reject the same "wooden

interpretation" that would hamstring efforts to prevent the remote detonation of explosive

devices.

      Plaintiff does not offer a definition of the word "investigation."  Presumably, it interprets

the term to refer to efforts to identify a criminal after a crime has been committed.  But even if

the Court, contrary to *U.S. News*, adopts this narrower interpretation of the term "investigation,"

there is a "conceivable connection" between SOP 303 and law enforcement investigations.

Indeed, the connection is a simple matter of common sense:  Preventing explosives from

detonating preserves evidence – *i.e.*, the bomb and its surroundings – and, thereby, facilitates the

investigation into who built and placed the bomb.  Once a bomb detonates, the explosion (or the

fire that sometimes results) damages or destroys evidence.  This evidence includes the precise

design of the bomb – a clue that can point to the bomb designer given the propensity for bomb

makers to use similar designs and materials over time, *see United States v. Trenkler*, 61 F.3d 45,

54-56 (1st Cir. 1995) (determining that a prior bombing was similar enough to the one at issue in

the case to allow evidence of the prior bombing to be introduced under Federal Rule of Evidence

404(b)) – and other physical evidence connecting the bomb to its source, *see United States v. Gullett*, 75 F.3d 941, 945 (4th Cir. 1996) (explaining that trial testimony established that had a bomb exploded "as planned, the explosion would have . . . destroyed all evidence of wrongdoing").   SOP 303 is primarily intended to help prevent bombs from detonating.   Thus, SOP 303 supports efforts to identify, though investigation, those responsible for the creation and placement of a bomb.

Plaintiff attempts to bolster its argument that SOP 303 is unconnected to law enforcement investigations by noting that "DHS's enabling statute expressly gives primar[y] authority for terrorism investigations and prosecutions to other agencies."   Opp. at 9-10.   But that DHS may have a secondary role in some investigations does not mean that it has *no* role in those (or other) investigations.   Secondary is not a synonym for non-existent.   And DHS's connection to relevant investigations, through coordination of the process set out in SOP 303, is described above.   In short, Exemption 7(E) protects the withheld portions of SOP 303.

II.   Exemption 7(F) Supports the Withholding of Segments of SOP 303

Exemption 7(F) shields from disclosure a record compiled for a law enforcement purpose, if its production "could reasonably be expected to endanger the life or physical safety of any individual."   5 U.S.C. § 552(b)(7)(F).   DHS explained in its opening brief that production of SOP 303 would meet this standard.   SJ Memo. at 12-13.   Again, SOP 303 describes a procedure for shutting down wireless networks to prevent bombings that would endanger lives or physical safety.   Holzer Decl.   ¶ 25.   Releasing information regarding this process could enable "bad actors" to circumvent it, thus increasing the chances that the process will fail and a bomb will explode.   *See id.* ¶ 26.   DHS's decision to withhold portions of SOP 303 under Exemption 7(F) parallels the Bureau of Reclamation's successful invocation of Exemption 7(F) over inundation

maps, which described the effects of dam failures for the areas downstream from the Hoover and

Glen Canyon Dams, and which could be used to aid terrorist attacks on the dams that would

jeopardize the downstream population.  *Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F.

Supp. 2d 1313, 1321-22 (D. Utah 2003).  Importantly, "[w]ithin limits, the Court[s] defer[] to

[an] agency's assessment of danger." *Amuso v. U.S. Dep't of Justice*, 600 F. Supp. 2d 78, 101

(D.D.C. 2009).  The assessment of danger in this case by DHS is eminently reasonable and

deserving of deference.

　　　Plaintiff contends that Exemption 7(F) does not apply for three reasons, and that *Living*

*Rivers* is unpersuasive.  First, plaintiff insists that the exemption applies only in a situation not

present here, namely, when (i) the information released will reveal the identity of an individual

"mentioned in law enforcement files," and (ii) this revelation will place the individual in danger.

Opp. at 11 (internal quotation marks omitted).  Second, plaintiff maintains that the individuals

identified as being in danger are not identified with adequate specificity.  Opp. at 12.  Though

plaintiff concedes that DHS "need not identify [the endangered] individuals by name," it argues

that there must be "identifying characteristics" limiting the pool of potentially endangered

persons to a small group.  Opp. at 12.  Third, plaintiff suggests that Exemption 7(F) does not

apply because the threatening activity is "hypothetical."  Opp. at 13-14.  Finally, plaintiff argues

that *Living Rivers* does not support the invocation of Exemption 7(F) in this case because "the

population at risk in *Living Rivers* was a specific, identifiable group, and the population that

DHS seeks to protect in this case is some hypothetical group of the public."  *Id.* at 13.

　　　All of plaintiff's arguments lack merit.  Exemption 7(F) does not protect only information

that would reveal the identity of individuals mentioned in law enforcement files.  By its terms,

the exemption extends to all "records or information compiled for law enforcement purposes"

that, if released, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).  Thus, Courts repeatedly have upheld agencies' decisions to withhold, under Exemption 7(F), information other than individuals' identities.  *Zander v. Dep't of Justice*, 885 F. Supp. 2d 1, 7-8 (D.D.C. 2012) (deciding that the Bureau of Prisons properly withheld, under Exemption 7(F), a video showing a prisoner being forcibly removed from his cell because disclosure of the recording "presents the possibility that other prisoners will learn the methods and procedures utilized by BOP officials, and [ ] this information might be used to thwart the safe application of these techniques in the future"); *Pub. Employees for Envtl. Responsibility v. U.S. Section Int'l Boundary & Water Comm'n*, 839 F. Supp. 2d 304, 327-28 (D.D.C. 2012) (appeal pending, Docket No. 12-5158) (concluding that a federal commission properly withheld inundation maps for two dams, under Exemption 7(F), because they could be used to facilitate attacks on the dams and, thus, their release would endanger the downstream population); *Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Protection*, 2006 WL 1826185, at *8-9 (D.D.C. June 30, 2006) (holding that Customs properly withheld information regarding seized contraband, under Exemption 7(F), because releasing it could put Custom's officials and bystanders at risk from people who could attempt to acquire the contraband); *Living Rivers, Inc.*, 272 F. Supp. 2d at 1321-22; *see also Milner*, 131 S. Ct. at 1272 (Alito, J., concurrence) (stating that "[i]n most cases involving security information, it is not difficult to show that disclosure may endanger the life or physical safety of any individual") (internal quotation marks omitted from parenthetical description).  The decisions make sense not only because they accord with the text of the exemption, but also because, as a matter of logic, information other than that relating to a person's identity could reasonably be expected to endanger a person's life or physical safety.

Plaintiff's argument that Exemption 7(F) is inapplicable because DHS did not identify the endangered persons with specificity is similarly unavailing.  Exemption 7(F) applies broadly to "any individual."  5 U.S.C. § 552(b)(7)(F).  "[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008).  Plaintiff identifies no language in the statute that limits the expansive breadth of the word "any" only to identifiable individuals.  (Congress employed the "any individual" language to broaden the scope of the exemption from its previous form, which limited protection to "law enforcement personnel."  5 U.S.C. § 552(b)(7)(F) (1982).).  In the FOIA's companion statute, the Privacy Act, Congress afforded special treatment to law enforcement records connected to an "identifiable individual."  5 U.S.C. § 552a(j)(2)(B).  But Congress adopted no similar limiting language in the FOIA.

Nor is there a practical justification for the extra-textual (specific identification) limitation proposed by plaintiff.  Plaintiff provides no pragmatic explanation for requiring an agency to be able to specifically identify the person or persons who would be endangered by a document's release in order to invoke Exemption 7(F).  It would be irrational to value human lives differently based on whether their identities are known ahead of time, and plaintiff provides no reason to believe that Congress intended such an irrational result.  Moreover, the extra-textual identification limitation created by plaintiff is not needed simply to put some limit on the exemption.  Exemption 7(F) is not limitless in scope:  Congress established the reasonable expectation of danger requirement as a check on the reach of this exemption.  5 U.S.C. § 552(b)(7)(F).  And as the probability of harm is the limiting principle, knowing the identity of the person who would be harmed is irrelevant, because the probability of harm does not change based on whether the person can be specifically identified ahead of time.  In crafting its

argument, plaintiff appears to have taken its cues from a Second Circuit decision, *ACLU v. Dep't of Defense*, 543 F.3d 59 (2d Cir. 2008).  But the Supreme Court vacated that decision (on the basis of a statute enacted to address the kind of documents at issue in that case, *Dep't of Defense v. ACLU*, 558 U.S. 1042 (2009)), which in any case suffered from the same problems that beset plaintiff's argument.

Plaintiff's suggestion that Exemption 7(F) does not apply because the threatening activity is "hypothetical" lacks a textual foundation and contradicts precedent.  Opp. at 13-14.  Nothing in the text of Exemption 7(F) limits its application to situations in which there is an existing, specific threat such as, "if I find out who informed on me, then I will kill him."  The text is broad in scope, as discussed earlier.  And while a document revealing the identity of an informant who has been threatened likely would be covered, that does not mean documents containing other kinds of information, the release of which could endanger lives or physical safety, are not covered.  *Zander*, *Public Employees for Environmental Responsibility*, *Peter S. Herrick's,* and *Living Rivers* all ratified the withholding of information on the basis threats, like the one at issues in this case, that plaintiff likely would label as "hypothetical" because they lack the definiteness of the threatened-informant hypothetical.  *Zander*, 885 F. Supp. 2d at 6-8; *Pub. Employees for Envtl. Responsibility*, 839 F. Supp. 2d at 325-26, 327-28; *Peter S. Herrick's*, 2006 WL 1826185, at *5, 8-9; *Living Rivers*, 272 F. Supp. 2d at 1316, 21-22.  Exemption 7(F) does require, of course, that the prospect of danger be "reasonabl[e]."  But plaintiff offers no evidence that the prospect of danger identified by DHS is unreasonable.  It is not.  Terrorists have used cell phones to remotely detonate bombs in the past.  Serge Schmemann, *Hamas Members Held in Recent Bombings*, N.Y. Times, August 22, 2002, at A1 (explaining that a cell phone was used to remotely detonate a bomb at Hebrew University in Israel that killed nine people, including

five Americans).  And in any case, even if there were some question about the reasonableness of

DHS's danger assessment (which there is not), that doubt would be resolved in favor of DHS

because "[w]ithin limits, the Court[s] defer[] to [an] agency's assessment of danger." *Amuso*, 600

F. Supp. 2d at 101.

Finally, plaintiff's effort to distinguish *Living Rivers* from this case fails.  Plaintiff insists

that the key difference between the cases is that "the population at risk in *Living Rivers* was a

specific, identifiable group, [but] the population that DHS seeks to protect in this case is some

hypothetical group of the public."  Opp. at 13.  But, as explained above, Exemption 7(F) does not

require that the agency be able to specifically identify the people in danger in order to withhold a

document.  Also, with respect to *Living Rivers*, the group of people who would be affected by

attacks on the immense Hoover and Glen Canyon Dams cannot reasonably be described as

"specific" and "identifiable." The group would include not only residents, but people passing

through the large downstream areas on business or pleasure.  And, in any event, not all residents

would be there at any given time.  Moreover, the extent to which a dam failed would determine

the size of the area affected; a partial failure of a dam presumably would not jeopardize all of the

same people as a total failure of one of the dams.  Thus, the distinction is illusory.

Plaintiff's description of the group of people jeopardized by the potential release of SOP

303 as "hypothetical," in the course of comparing this case to *Living Rivers*, could be misleading.

Opp. at 13.  The people are not imaginary; they are real.  And while they cannot be specifically

identified ahead of time – beyond the fact that they would be within the blast radius of a

remotely detonated bomb – that does not mean they do not exist.  In any case, they are no more

hypothetical that the individuals who would have been jeopardized by the release of records in

*Zander*, *Public Employees for Environmental Responsibility*, *Peter S. Herrick's*, or *Living*

11

*Rivers.* Indeed, in *Peter S. Herrick's* the court upheld U.S. Custom's and Border Protection's decision to withhold documents to protect "innocent third parties located in the vicinity of Custom's officials, activities, or seized contraband," a group of shifting membership which, by its nature, could not be identified ahead of time. 2006 WL 1826185, at *8-9. Exemption 7(F) applies to SOP 303.

III. **DHS Appropriately Segregated Non-Exempt Portions of SOP 303 from Exempt Portions of the Document**

Plaintiff contends that "DHS failed to perform an adequate segregability analysis." Opp. at 14. It argues that DHS has provided "nothing more than empty invocation[s] of the segregability standard that the Court should reject." *Id.* at 15 (internal quotation marks omitted). And it suggests that, "at the very least, the predetermined shutdown questions contained within SOP 303 should be segregated and released." Opp. at 15. Plaintiff is wrong on both counts: DHS has adequately justified its segregability decisions, and DHS appropriately withheld the predetermined shutdown questions under Exemptions 7(E) and 7(F).

DHS must provide a "detailed justification" for its segregability decisions. *Johnson*, 310 F.3d at 776 (internal quotations omitted). But "the agency is not required to provide so much detail that the exempt material would be effectively disclosed." *Id.* A detailed description of the withheld material, in conjunction with a declaration establishing that the agency has reviewed the document and determined that no other information may be released without compromising the withheld material, suffices to discharge the agencies responsibility to justify its decisions. *Id.*; *Soghoian v. OMB*, 2013 WL 1201488, at *14 (D.D.C. March 26, 2013). What is more, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

12

DHS provided a detailed justification for its segregability decisions.  It explained that SOP 303 establishes a "unified voluntary process for the orderly shut-down and restoration of wireless services during critical emergencies such as the threat of radio-activated improvised explosive devices.  The SOP establishes a procedure by which state [and federal] homeland security officials can directly engage with wireless carriers, and it establishes factual authentication procedures for decision-makers."  Holzer Decl. ¶ 20.  The agency also pointed out that SOP 303 includes "the full text of the pre-determined series of questions that determines if a shutdown is necessary, and the executing protocols related to the implementation of SOP 303." *Id.* ¶ 21.  Further, DHS reviewed SOP 303 and determined that "some information in the SOP could be released without compromising law enforcement or privacy objectives," *id.* ¶ 22, but that releasing the rest of the document would compromise the interests protected by the exemptions invoked by DHS, *see id.*[3]  The agency explained how law enforcement objectives would be compromised:  "Making SOP 303 public would enable bad actors to circumvent or interfere with a law enforcement strategy . . . by providing information about when shutdown procedures are used and how a shutdown is executed."  *Id.* ¶ 25.  And DHS even gave a specific example of how "bad actors" could use information from the withheld portions of 303 to interfere with the shutdown process:  "Making SOP 303 public would, *e.g.*, enable bad actors to insert themselves into the process of shutting down or reactivating wireless networks by appropriating verification methods and then impersonating officials designated for involvement in the verification process."  *Id.* ¶ 26.

---

[3] Plaintiff states on page 5 of its brief that "[w]ith the exception of a few subject headings, the document [*i.e.*, SOP 303] was entirely redacted."  This is untrue. The redacted version of SOP 303 provided to plaintiff also includes, among other things, the document's statement of purpose as well contact information for the state homeland security offices that would be involved in the process of deciding whether to shut down a wireless network. *See* Ex. 2 to Opp. at 1, 8-18.

DHS's detailed description of the document, in conjunction with the  statement that it has segregated and released all non-exempt material, suffices to satisfy the agency's burden to justify it segregability decisions.  *Johnson*, 310 F.3d at 776.  This is especially true given that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," *Sussman*, 494 F.3d at 1117, and are "not required to provide so much detail that the exempt material would be effectively disclosed," *Johnson*, 310 F.3d at 776.

DHS's ample justification of its segregability decision suffices to overcome plaintiff's argument that it is entitled to the text of the pre-determined series of questions that determine if a shutdown is appropriate.  But plaintiff's argument also fails for other reasons.  Plaintiff contends that the questions "are plainly not law enforcement techniques" because they "are not a means of accomplishing a wireless telecommunications shutdown," but "of determining whether to employ a shutdown in the first place."  Opp. at 15.  "In other words," plaintiff continues, "the shutdown questions are a matter of general policy that precede the use of any specific shutdown technique."  *Id.* at 15.  And, plaintiff adds, "release of the predetermined shutdown questions would cause no harm to law enforcement interests" as "bad actors would not be able to use the predetermined shutdown questions alone to defeat shutdown of wireless networks because they would still lack necessary information contained in the rest of SOP 303."  *Id.* at 15-16.

These arguments fail.  As the declaration explains, "SOP 303 establishes a protocol for verifying that circumstances exist that would justify shutting down wireless networks."  Holzer Decl. ¶ 25.  Disclosure would not be appropriate, even if the technique described were not a law enforcement technique, because Exemption 7(F) does not shield only law enforcement techniques; it shields records and information that "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  In any case, plaintiff offers

no support for the argument that the process described by SOP 303 is not a law enforcement technique, but rather is a "matter[ ] of general public policy that precede[s] the use of any specific shutdown technique." Opp. at 15. There is no support available. The process described in SOP 303 is a technique, *i.e.*, "a particular way of doing or going about the accomplishment of something," Webster's Third New Int'l Dictionary (1986) (defining "technique"). To wit, SOP 303 is a "particular way" of determining "that circumstances exist that would justify shutting down wireless networks." Holzer Decl. ¶ 25. And it is a "law enforcement" technique, as it is designed to, among other things, facilitate the prevention of the remote detonation of bombs. Understandably, courts have determined that documents describing law enforcement processes fall under Exemption 7(E). *See, e.g.*, *Peter S. Herrick's*, 2006 WL 1826185, at *7.

Finally, plaintiff's statement regarding the lack of harm from disclosure is erroneous. The first clause of Exemption 7(E) encompasses "techniques and procedures for law enforcement investigations or prosecutions," and the second clause covers "guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). DHS need not demonstrate the existence of harm to withhold documents under the first clause of Exemption 7(E), the clause it invokes in this case. "The first clause of Exemption 7(E) affords 'categorical' protection for 'techniques and procedures' used in law enforcement investigations or prosecutions." *Dent v. Exec. Office for U.S. Attorneys*, 2013 WL 782625, at *11-12 (D.D.C. March 2, 2013). *See also Strunk v. U.S. Dep't of State*, 905 F. Supp. 2d 142, 147 (D.D.C. 2012); *Pub. Employees for Envtl. Responsibility*, 839 F. Supp. 2d at 327; *Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010). Plaintiff cites *Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011), for the proposition that DHS must demonstrate some harm will follow from

disclosure.  But, in *Blackwell*, the FBI did not argue that the first clause of Exemption 7(E) provides "categorical protection," Brief for FBI (appellee), *Blackwell v. FBI*, 2010 WL 6368288, at 31 (Dec. 29, 2010), so the court was not presented with the question of whether the different clauses of Exemption 7(E) contain different requirements.  Thus, the Court's decision in *Blackwell*, which never specifically addresses the issue, is not precedent as to this matter.  *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448–49 (2011); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37-38 (1952).  In any case, DHS explained that disclosure of SOP 303 would lead to harm:  Its release could reasonably be expected to endanger the life or physical safety of "any individual."  Holzer Decl. ¶ 26.  Plaintiff contends that the release of the predetermined questions alone would not lead to this harm because "bad actors" would lack other information necessary to frustrate the shutdown process.  Opp. at 16-17.  But this is not true:  Releasing the questions "would enable bad actors to circumvent [the shutdown process] . . . by providing information about when shutdown procedures are used . . . ."  Holzer Decl. ¶ 25

IV.  <u>There Are No Disputes of Material Fact</u>

In Plaintiff's Statement of Material Facts as to Which There Is a Genuine Issue, Plaintiff contends that there exist material factual disputes as to information contained in paragraphs 2, 21, 23, and 25 of DHS's statement of undisputed material facts, Doc. No. 10 (DHS SMF).  Pl. SMF ¶ 2.  But, in reality, there are no disputes of fact.

Paragraph 2 of DHS's statement of facts reads as follows, "Standard Operating Procedure (SOP) 303 is a document that details a process for the 'deactivation of wireless networks' primarily to 'deter the triggering of radio-activated improvised explosive devices."  DHS SMF ¶2 (quoting Holzer Decl. ¶ 25).  Plaintiff argues that "there is a genuine issue as to whether details of the deactivation process are *all* that is included in SOP 303," because, plaintiff adds,

information indicates that "SOP 303 also includes a predetermined series of questions used to decide when deactivation is appropriate."  Pl. SMF ¶¶ 3, 4 (emphasis in original).  There is no dispute of fact about this issue.  DHS acknowledges that SOP 303 includes this series of questions.  Holzer Decl. ¶ 21.  The dispute is about whether this "predetermined series of questions" is part of a law enforcement technique.  *See* § III above.  But this is a legal question, not a factual one.  *See id.*

Paragraphs 21, 23, and 25 of DHS's statement of material facts all follow the same pattern:  They state that "the agency determined [X]," with X being a legal conclusion.  In paragraph 21, the determination was that Exemption 7(E) applies; in paragraph 23, it was that Exemption 7(F) applies; and in paragraph 25, it was that the agency segregated and released all non-exempt information.  DHS SMF ¶¶ 21, 23, 25. Plaintiff does not challenge the facts that these paragraphs state, which is that the DHS made certain determinations.  Rather, plaintiff challenges the substance of the determinations, *i.e.*, the legal conclusions, made by the agency.  But disputes about legal conclusions are not disputes of fact.  Indeed, insofar as plaintiff has cross-moved for summary judgment, it must ultimately agree that the disputes it has identified are legal, rather than factual, in nature.

## CONCLUSION

For the reasons stated above and in DHS's opening brief, the Court should enter judgment in DHS's favor with respect to Count III.  Plaintiff's other claims have been conceded and so should be dismissed as well.   The Court should accordingly deny plaintiff's cross-motion for summary judgment.

Dated:  August 9, 2013                         Respectfully submitted,

                                               STUART F. DELERY
                                               Assistant Attorney General

                                               RONALD C. MACHEN JR
                                               United States Attorney

                                               ELIZABETH J. SHAPIRO
                                               Deputy Director, Federal Programs Branch,
                                               Civil Division

                                                  /s/ Justin M. Sandberg
                                               JUSTIN M. SANDBERG
                                               (Ill. Bar No. 6278377)
                                               Trial Attorney
                                               U.S. Dept. of Justice, Civil Division,
                                               Federal Programs Branch
                                               20 Mass. Ave., NW, Rm. 7302
                                               Washington, DC 20001
                                               (202) 514-5838 phone
                                               (202) 616-8202 fax
                                               justin.sandberg@usdoj.gov

                                               Attorneys for Defendant