**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ELECTRONIC PRIVACY INFORMATION CENTER,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  13-260 (JEB)** |
| **DEPARTMENT OF HOMELAND SECURITY,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

This case concerns efforts of the Electronic Privacy Information Center under the

Freedom of Information Act to obtain documents related to the Department of Homeland

Security's Standard Operating Procedure 303.  This protocol governs the shutdown of wireless

networks in emergencies to, *inter alia*, prevent the remote detonation of explosive devices.  After

DHS withheld the lion's share of the one responsive document it found, EPIC brought this

action.  DHS now moves for summary judgment, arguing that its search for documents was

adequate, that it properly withheld the bulk of SOP 303 under applicable FOIA exemptions, and

that no other non-exempt parts of the document could be released.  EPIC cross-moves for

summary judgment, contending that the two exemptions DHS relied on to withhold most of the

document, 7(E) and 7(F), do not apply here.  As the Court believes EPIC has the better of this

argument, it will dispose of the Motions accordingly.

## I.     Background

Standard Operating Procedure 303 is an "Emergency Wireless Protocol[] . . . codifying a

shutdown and restoration process for use by commercial and private wireless networks during

national crises." National Security Telecommunications Advisory Committee, NSTAC Issue

Review 2006-07 at 139 (2007), http://www.dhs.gov/sites/default/files/publications/2006-

2007%20NSTAC%20Issue%20Review_0.pdf.  The wireless networks could be shut down in

certain emergency situations to, *inter alia*, "deter the triggering of radio-activated improvised

explosive devices." See Def. Mot., Exh. 2 (Declaration of James V.M.L. Holzer), ¶ 25.

On July 10, 2012, EPIC submitted a FOIA request to DHS seeking: "(1) the full text of

Standard Operating Procedure 303 (SOP 303), which describes a shutdown and restoration

process for use by 'commercial and private wireless networks' in the event of a crisis; (2) the full

text of the pre-determined 'series of questions' that determines if a shutdown is necessary; and

(3) any executing protocols or guidelines related to the implementation of SOP 303, distributed

to DHS, other federal agencies, or private companies, including protocols related to oversight of

shutdown determinations." Id., ¶ 9.  DHS responded to EPIC on August 21, 2012, saying that it

"had conducted comprehensive searches for records that would be responsive to the request[,

but] . . . that [DHS was] unable to locate or identify any responsive records." Id., ¶ 16.  EPIC

administratively appealed on October 2, 2012, and on March 25, 2013, the United States Coast

Guard, Office of the Chief Administrative Law Judge – the office that reviews these FOIA

appeals – "remanded the matter back to DHS Privacy for further review." Id., ¶¶ 17-18.

Upon additional inspection, DHS located one responsive record, the very document EPIC

had requested: Standard Operating Procedure 303.  Id., ¶¶ 19-20.  "Included as part of SOP 303

itself are the two other categories of records that EPIC seeks, *i.e.*, the full text of the pre-

determined series of questions that determines if a shutdown is necessary, and the executing

protocols related to the implementation of SOP 303." Id., ¶ 21.  DHS "determined that the SOP

is the only responsive document because there are no other documents that contain the full text

of the questions or any executing protocols." Id.

Portions of SOP 303 – "names, direct-dial telephone numbers, and email addresses for

state homeland security officials" – were withheld from EPIC under Exemptions 6 and 7(C),

which generally permit withholding of personal information. Id., ¶¶ 23-24. The remainder of

the document was withheld under Exemptions 7(E) and 7(F), which permit withholding of

certain law-enforcement information if it, respectively, would "disclose techniques and

procedures for law enforcement investigations or prosecutions" or "could reasonably be expected

to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7); Holzer Decl., ¶¶

25-26.

On February 27, 2013, EPIC filed this lawsuit seeking the release of the withheld

portions of SOP 303. Both parties have now cross-moved for summary judgment.

## II.      Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A genuine issue of material fact is one that would change the outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment."). In the event of conflicting evidence on a material issue, the Court is to

construe the evidence in the light most favorable to the non-moving party. See Sample v. Bureau

of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006). Factual assertions in the moving party's

affidavits or declarations may be accepted as true unless the opposing party submits his own

affidavits, declarations, or documentary evidence to the contrary.  Neal v. Kelly, 963 F.2d 453,

456 (D.C. Cir. 1992).

FOIA cases typically and appropriately are decided on motions for summary judgment.

See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v.

U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  In FOIA cases, the agency

bears the ultimate burden of proof.  See U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136,

142, n.3 (1989).  The Court may grant summary judgment based solely on information provided

in an agency's affidavits or declarations when they describe "the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey,

656 F.2d 724, 738 (D.C. Cir. 1981).  Such affidavits or declarations are accorded "a presumption

of good faith, which cannot be rebutted by 'purely speculative claims about the existence and

discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### III.    Analysis

Congress enacted FOIA in order to "pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361

(1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to

the functioning of a democratic society, needed to check against corruption and to hold the

governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146,

152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for

records which (i) reasonably describes such records and (ii) is made in accordance with

published rules . . . shall make the records promptly available to any person." 5 U.S.C. §

552(a)(3)(A). Consistent with this statutory mandate, federal courts have jurisdiction to order

the production of records that an agency improperly withholds. See 5 U.S.C. § 552(a)(4)(B);

Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial

evidence and not arbitrary and capricious, FOIA expressly places the burden 'on the agency to

sustain its action' and directs the district courts to 'determine the matter de novo.'" Reporters

Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). "At all times courts must bear in

mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ." Nat'l Ass'n of

Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502

U.S. 164, 173 (1991)).

In moving for summary judgment, DHS first contends that its search was adequate. EPIC

does not contest this point. DHS next maintains that its withholding of personal identifying

information under Exemptions 6 and 7(C) was appropriate. EPIC makes no challenge here

either. See Opp. at 5 n.1. Instead, it saves its ammunition for DHS's claim that it properly

withheld the bulk of SOP 303 under both Exemption 7(E) and 7(F). Because the Court

ultimately finds that the agency's invocation of these exemptions was not proper, it need not

address the last issue EPIC raises – namely, whether DHS performed an appropriate

segregability analysis. The Court will begin with a discussion of 7(E) and then move to a

consideration of 7(F).

  A. Exemption 7(E)

Exemption 7 authorizes the Government to withhold "records or information compiled

for law enforcement purposes, but only to the extent that the production of such law enforcement

records or information" meets one of six requirements.  5 U.S.C. § 552(b)(7); see Keys v. Dep't

of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987) ("[Exemption 7] exempts such documents from

disclosure only to the extent that production of the information might be expected to produce one

of six specified harms.").  The fifth subparagraph – 7(E) – permits withholding where production

"would disclose techniques and procedures for law enforcement investigations or prosecutions."

5 U.S.C. § 552(b)(7)(E).  The agency here must thus satisfy two requirements:  First, the record

must be compiled for law-enforcement purposes; and second, production must disclose

techniques and procedures for law-enforcement investigations.

DHS clearly surpasses the first hurdle.  "Steps by law enforcement officers to prevent

terrorism surely fulfill 'law enforcement purposes.'"  Milner v. Dep't of Navy, 131 S. Ct. 1259,

1272 (2011) (Alito, J., concurring).  DHS need only make "a colorable claim" of a rational nexus

"between the agency's activity [that created the document] and its law enforcement duties."

Keys, 830 F.2d at 340.  DHS created SOP 303 to "establish[] a protocol for verifying that

circumstances exist that would justify shutting down wireless networks" "to efficiently and

effectively deter the triggering of radio-activated improvised explosive devices."  Holzer Decl., ¶

25.  There is, accordingly, a rational nexus between SOP 303's protocol for preventing the

triggering of radio-activated IEDs and DHS's law-enforcement purpose of keeping the country

safe.

DHS's trouble comes at the second step, which requires that the disclosure would reveal

"techniques and procedures for law enforcement investigations or prosecutions."  5 U.S.C. §

552(b)(7)(E).  The key question is whether the agency has sufficiently demonstrated how SOP

303, which articulates protective measures, is a technique or procedure "for law enforcement

investigations or prosecutions."  Id.

The Court must begin by "presum[ing] that a legislature says in a statute what it means

and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249,

253-54 (1992).  Of particular relevance here, Congress amended FOIA in 1986.  See PL 99-570,

Oct. 27, 1986, 100 Stat 3207.  Prior to the 1986 amendments, to merit withholding, Exemption 7

first required "investigatory records compiled for law enforcement purposes," and subparagraph

(E) then required that the records would "disclose investigative techniques and procedures."  See

PL 93-502, Nov. 21, 1974, 88 Stat 1561.  The 1986 amendments "delet[ed] any requirement [in

the first step] that the information be 'investigatory,'" Tax Analysts, 294 F.3d at 79, and

broadened the permissible withholding to "records or information compiled for law enforcement

purposes."  See PL 99-570, Oct. 27, 1986, 100 Stat 3207.  Congress, however, retained the

investigatory requirement in 7(E).  See id. (slightly modifying subparagraph (E), but keeping

requirement that information be "for law enforcement investigations or prosecutions").  Congress

thus specifically and intentionally chose to remove the investigatory requirement from the first

step and to leave it in the second step.  The Court, therefore, will apply "the usual rule that 'when

the legislature uses certain language in one part of the statute and different language in another,

the court assumes different meanings were intended.'"  Sosa v. Alvarez-Machain, 542 U.S. 692,

711 n.9 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th

rev. ed. 2000)).

Looking at the amended language, the Court agrees with the Government that Exemption

7's mention of "law enforcement purposes" may certainly include preventive measures.  See

Mot. at 9-10.  The problem is that 7(E)'s reference to "law enforcement investigations and

prosecutions" does not.  This distinction finds support in Justice Alito's concurrence in Milner, a

case that dealt with the applicability of Exemption 2.  In his opinion, Justice Alito explained that

"[t]he ordinary understanding of law enforcement [purposes] includes not just the investigation and prosecution of offenses that have already been committed, but also proactive steps designed to prevent criminal activity and to maintain security." Milner, 131 S. Ct. at 1272 (Alito, J., concurring). Justice Alito went on to explain how, in context, Exemption 7's reference to "law enforcement purposes" "involve[s] more than just investigation and prosecution," which he describes as "narrower activities" confined to Exemption 7's subparagraphs. See id. at 1273 ("Congress' decision to use different language to trigger Exemption 7 confirms that the concept of 'law enforcement purposes' sweeps in activities beyond [subparagraph (E)'s] investigation and prosecution.")

If "techniques and procedures for law enforcement investigations or prosecutions" is given its natural meaning, it cannot encompass the protective measures discussed in SOP 303. This term refers only to acts by law enforcement after or during the commission of a crime, not crime-prevention techniques. Reading Exemption 7(E) as such, moreover, is in keeping with FOIA's "basic policy that disclosure, not secrecy, is the dominant objective of the Act," Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n, 533 F.3d 810, 813 (D.C. Cir. 2008) (internal quotation marks omitted), and the well-settled practice of reading FOIA exemptions narrowly. See Milner, 131 S. Ct. at 1265 ("We have often noted 'the Act's goal of broad disclosure' and insisted that the exemptions be 'given a narrow compass.'") (quoting Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989)).

In arguing against such an interpretation, DHS relies on a nearly 30-year-old case from this district that upheld the Secret Service's invocation of Exemption 7(E) to shield "records pertaining to . . . two armored limousines for the President." U.S. News & World Report v. Dep't of Treasury, 1986 U.S. Dist. LEXIS 27634, at *1 (D.D.C. March 26, 1986). In that case,

the court rejected plaintiff's argument – similar to the one EPIC makes here – "that the information at issue [] would reveal 'protective' not 'investigative' techniques and procedures" and concluded that "[i]t is inconceivable . . . that Congress meant to afford these [preventive] activities any less protection from disclosure simply because they do not fit within the traditional notion of investigative law enforcement techniques." Id. at *6. This case, however, was decided before the 1986 amendments changed the language of the relevant clauses, making it not "inconceivable," but in fact probable that Congress intended to differentiate between preventive and investigative activities. U.S. News also predates Milner's insistence on reading the exemptions narrowly. See 131 S. Ct. at 1265; see also Dep't of Justice v. Landano, 508 U.S. 165, 181 (1993) (noting Court's "obligation to construe FOIA exemptions narrowly in favor of disclosure"). The Court, therefore, does not believe U.S. News dictates a different result.

The agency's last gambit is a *post hoc* attempt in its Reply to classify SOP 303 as an investigative technique. It claims that "[p]reventing explosives from detonating preserves evidence . . . and, thereby, facilitates the investigation into who built and placed the bomb." See Def's Reply at 5-6. This is too little, too late. As EPIC notes, "[N]o ordinary speaker of the English language" would describe SOP 303 – "a protocol for verifying that circumstances exist that would justify shutting down wireless networks" "to efficiently and effectively deter the triggering of radio-activated improvised explosive devices," Holzer Decl., ¶ 25 – as an evidence-gathering technique. Pl's Reply at 3.

The Court will thus read Exemption 7(E) in a manner that harmonizes with FOIA's purpose of disclosure, the canons of statutory construction, and the Supreme Court's guidance to read FOIA's exemptions narrowly.

B. Exemption 7(F)

DHS next argues that SOP 303 was also properly withheld under Exemption 7(F). This exemption authorizes the Government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). As the Court explained in relation to Exemption 7(E), the agency easily clears the "law enforcement purposes" hurdle. See Section III.A, *supra*.

Yet again, though, the second requirement leads to DHS's undoing. DHS must show that production would "endanger the life or physical safety of <u>any individual</u>." 5 U.S.C. § 552(b)(7)(F) (emphasis added). The agency argues that SOP 303's "disclosure could reasonably be expected to endanger the physical safety of individuals near unexploded bombs." Mot. at 13. DHS's thinking goes like this: 1) SOP 303 "describes a procedure for shutting down wireless networks to prevent bombings"; 2) "[r]eleasing information regarding this protocol would enable 'bad actors' to blunt its usefulness"; and 3) this "could reasonably be expected to endanger the physical safety of those near a bomb by increasing the chances that the process will fail and the bomb will explode." Id. In other words, the "any individual" test is satisfied because those endangered are any individuals near a bomb. Although this interpretation holds some appeal, the Court must conclude that the agency reads the "any individual" standard too broadly.

While DHS is correct that Exemption 7(F) is not limited to protecting <u>law-enforcement</u> personnel from harm, see <u>Amuso v. Dep't of Justice</u>, 600 F. Supp. 2d 78, 101 (D.D.C. 2009), the agency still must identify the individuals at risk with some degree of specificity. See <u>ACLU v. Dep't of Defense</u>, 543 F.3d 59, 66-72 (2d Cir. 2008) ("The phrase 'any individual' in exemption 7(F) may be flexible, but is not vacuous."), <u>vacated on other grounds</u>, 558 U.S. 1042 (2009).

10

The Second Circuit in ACLU considered a similar question to the one raised here, and its

opinion is instructive.  The Government there wished to apply the "any individual" standard to

prevent the release of photographs "depict[ing] abusive treatment of detainees by United States

soldiers in Iraq and Afghanistan" on the ground that "the release of the disputed photographs will

endanger United States troops, other Coalition forces, and civilians in Iraq and Afghanistan."  Id.

at 63.  In an extensive examination of the phrase "any individual" – in light of the Supreme

Court's admonition to interpret FOIA exemptions narrowly – the court rejected the

Government's argument "that it could reasonably be expected that out of a population the size of

two nations and two international expeditionary forces combined, someone somewhere will be

endangered as a result of the release of the Army photos."  Id. at 71.  It concluded that "an

agency must identify at least one individual with reasonable specificity and establish that

disclosure of the documents could reasonably be expected to endanger that individual."  Id.

Central to the ACLU court's holding was its thorough examination of the legislative

history of 7(F), which this Court also finds significant.  Prior to the 1986 FOIA amendments,

Exemption 7(F) protected records, the release of which would "endanger the life or physical

safety of law enforcement personnel."  See PL 93-502, Nov. 21, 1974, 88 Stat 1561 (emphasis

added).  The exemption served to withhold "information which would reveal the identity of

undercover agents, State or Federal, working on such matters as narcotics, organized crime,

terrorism, or espionage."  Edward A. Levi, Attorney General's Memorandum on the 1974

Amendments to the Freedom of Information Act, pt. I.B (1975), available at

http://www.justice.gov/oip/74agmemo.htm, cited in ACLU, 543 F.3d at 77-78.  The exemption

did not cover witnesses, interviewees, victims, informants, or families of law-enforcement

personnel; as a result, among other impairments, it "harmed the ability of law enforcement

officers to enlist informants."  Statement of the Chair of the Senate Committee on the Judiciary's

Subcommittee on the Constitution (the subcommittee with jurisdiction over FOIA), 131 Cong.

Rec. S263 (daily ed. Jan. 3, 1985), cited in ACLU, 543 F.3d at 78.

To remedy this omission, the Government asked for an amendment to "modif[y] slightly

– not revise[] wholesale" – the scope of 7(F).  Statement of Carol E. Dinkins, Deputy Attorney

General, 131 Cong. Rec. S263 (daily ed. Jan. 3, 1985), cited in ACLU, 543 F.3d at 79.  As the

Government stated in support of the amendment:

> The current language in Exemption 7(F) exempts records only if
> their disclosure would endanger the life of a law enforcement
> officer.  However, the exemption does not give similar protection
> to the life of any other person.  [The proposed amendment]
> expands Exemption 7(F) to include such persons as witnesses,
> potential witnesses, and family members whose personal safety is
> of central importance to the law enforcement process.

Id., cited in ACLU, 543 F.3d at 78.  Congress complied, passing "only modest changes to the

FOIA . . . , [a]nd slight[ly] expan[ding] . . . exemption[] . . . (7)(F)."  Statement of the Chair of

the House Committee on Government Operations, Subcommittee on Government Information,

Justice, and Agriculture (the subcommittee with jurisdiction over FOIA), 132 Cong. Rec. H9455

(daily ed. Oct. 8, 1986), cited in ACLU, 543 F.3d at 79.

Congress ultimately settled on the broader term of "any individual," as opposed to, for

example, "any individual connected to or assisting law enforcement."  The Court, therefore,

would be overly restrictive if it defined "any individual" in the latter, cabined manner.  Yet,

bearing in mind the modest expansion intended and the prescription that exemptions must be

read narrowly, the Court must require some specificity and some ability to identify the

individuals endangered.

Against this backdrop, the Government here nonetheless seeks a broader interpretation of "any individual" than was rejected in ACLU.  The individuals that DHS claims satisfy the standard are anyone "within the blast radius of a remotely detonated bomb."  See Def's Mot. at 12-13; Def's Reply at 11.  As EPIC notes, "These hypothetical bombs" – like the hypothetical danger to troops and civilians in ACLU – "could materialize at any time, in any place, and affect anyone in the United States."  Pl's Reply at 9.  These individuals, therefore, are "identified only as a member of a vast population."  ACLU, 543 F.3d at 68.  In fact, the population is vaster here because it encompasses all inhabitants of the United States, while in ACLU it only covered people in Iraq and Afghanistan.  Indeed, if the Government's interpretation were to hold, there is no limiting principle to prevent "any individual" from expanding beyond the roughly 300 million inhabitants of the United States, as the Government proposes here, to the seven billion inhabitants of the earth in other cases.  This expansive interpretation of "any individual" is far broader than what the Government had in mind when it requested a "slight[]" enlargement of 7(F) in 1985, and far more than Congress approved in its "slight expansion of exemption[] . . . (7)(F)" in 1986.  See 131 Cong. Rec. at S263; 132 Cong. Rec. at H9455.

The primary case DHS relies on for the proposition that anyone near unexploded bombs is a specific-enough group, Living Rivers, Inc. v. U.S. Bureau of Reclamation, 272 F. Supp. 2d 1313 (D. Utah 2003), is easily distinguishable.  In that case, the court upheld the Government's invocation of Exemption 7(F) to withhold inundation maps that showed downstream communities that would be at risk in the event of dam failure.  Id. at 1315, 1321-22.  The danger was that terrorists could use the maps to better plan prospective attacks.  Id. at 1321.  There is a critical difference, however, between the populations in danger in that case and this one.  In Living Rivers, the Government contended that "disclosure of the inundation maps 'could

13

reasonably place at risk the life or physical safety of <u>those individuals who occupy the</u>

<u>downstream areas that would be flooded by a breach of Hoover Dam or Glen Canyon Dam</u>.'"

<u>Id.</u> (emphasis added) (internal citation omitted).  Here, the individuals at risk include anyone

near any unexploded bomb, which could include anyone anywhere in the country.  <u>See</u> Mot. at

12-13, Def's Reply at 11.  As the <u>Living Rivers</u> population was clearly specified and limited, the

case, even were it binding, does not affect the Court's decision.

The additional cases DHS cites in its Reply for the proposition that individuals need not

be specifically identified all involve far narrower groups with readily identifiable members than

those at risk here.  <u>See</u> <u>Zander v. Dep't of Justice</u>, 885 F. Supp. 2d 1, 7 (D.D.C. 2012) (upholding

7(F) withholding where Government identified class of people at risk as police officers working

in prisons while forcibly removing prisoners from their cells); <u>Pub. Employees for Envtl.</u>

<u>Responsibility v. U.S. Section Int'l Boundary & Water Comm'n</u>, 839 F. Supp. 2d 304, 327-28

(D.D.C. 2012) (upholding 7(F) withholding of inundation maps for similar reasons as those in

<u>Living Rivers</u>); <u>Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border</u>

<u>Prot.</u>, No. 04-00377, 2006 WL 1826185, at *8-9 (D.D.C. June 30, 2006) (upholding 7(F)

withholding relating to, *inter alia*, customs officials' seized contraband because information's

release would "put[] Customs' officials at risk from individuals who would seek to acquire such

items").

Reading 7(F) to encompass possible harm to anyone anywhere in the United States

within the blast radius of a hypothetical unexploded bomb also flies in the face of repeated

Supreme Court direction to read FOIA exemptions narrowly.  <u>See</u> <u>Milner</u>, 131 S. Ct. at 1265

("We have often noted 'the Act's goal of broad disclosure' and insisted that the exemptions be

'given a narrow compass.'") (quoting <u>Dep't of Justice v. Tax Analysts</u>, 492 U.S. 136, 151

14

(1989)); <u>Landano</u>, 508 U.S. at 181 (noting Court's "obligation to construe FOIA exemptions narrowly in favor of disclosure"); <u>Rose</u>, 425 U.S. at 361 (noting "basic policy that disclosure, not secrecy, is the dominant objective of the Act"). Exemption 7(F), therefore, cannot be read as expansively as the Government proposes, and thus cannot justify withholding SOP 303. The Court does not dispute that it will be difficult in some cases to decide whether endangered individuals have been sufficiently identified, but such hardship does not exist here.

*        *        *

In reaching its conclusion, the Court is not unaware of the potential adverse use to which this information could be put. Its ruling, furthermore, is no judgment on whether it is in the national interest for SOP 303 to be disclosed. If, in fact, the Government believes release will cause significant harm, it has other options to pursue. As the Supreme Court explained in <u>Milner</u>, "If these or other exemptions do not cover records whose release would threaten the Nation's vital interests, the Government may of course seek relief from Congress. . . .  All we hold today is that Congress has not enacted the FOIA exemption the Government desires. We leave to Congress, as is appropriate, the question whether it should do so." <u>Milner</u>, 131 S. Ct. at 1271. Indeed, in issuing guidance on FOIA exemptions in a post-<u>Milner</u> world, the Department of Justice's Office of Information Policy concluded that "it seems inevitable that there will be some sensitive records that will not satisfy the standards of any of the Exemptions." OIP Guidance, <u>Exemption 2 After the Supreme Court's Ruling in Milner v. Department of the Navy</u> 15 <u>available at</u> http://www.justice.gov/oip/foiapost/milner-navy.pdf. Standard Operating Procedure 303 is such a record.

15

**IV.     Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order granting judgment in Plaintiff's favor and ordering DHS to turn over SOP 303 – with redactions related only to Exemptions 6 and 7(C) – to Plaintiff within 30 days.  Mindful of the national-security implications involved, and appreciating that disclosure of SOP 303 would effectively moot any appeal, this Opinion and accompanying Order will be stayed for 30 days in order to allow for either appeal, should the Government wish to file one, or another type of cure – *e.g.*, classification of the document to exempt it from disclosure under Exemption 1 or legislation exempting it from FOIA under Exemption 3.  If DHS notices an appeal by December 12, 2013, the stay shall remain in effect until the Court of Appeals rules on such appeal.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 12, 2013